**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| MERIDIAN AUTOMOTIVE SYSTEMS- | ) | Case No. 05-11168(MFW) |
| COMPOSITE OPERATIONS, INC., | ) | (Jointly Administered) |
| et al. | ) |  |
|  | ) |  |
| Debtors. | ) |  |
| _____ | ) |  |

**OPINION[1]**

Before the Court is the Motion of Stanfield Capital
Partners, LLC for Entry of an Order Disqualifying Milbank, Tweed,
Hadley & McCloy as Counsel to the Informal Committee of First
Lien Lenders Pursuant to Rule 1.7 of the Delaware Lawyers' Rules
of Professional Conduct.  For the reasons set forth below, the
Court will grant the relief requested.

I.    BACKGROUND

Stanfield Capital Partners, LLC ("Stanfield") holds pre-
petition secured debt of Meridian Automotive Systems-Composite
Operations, Inc., and its affiliates (the "Debtors").  Some of
the debt is secured by a first lien on the Debtors' assets; some

---

[1]  This Opinion constitutes the findings of fact and conclusions
of law of the Court pursuant to Rule 7052 of the Federal Rules of
Bankruptcy Procedure, which is made applicable to contested
matters by Rule 9014 of the Federal Rules of Bankruptcy
Procedure.

is secured by a second lien.

In October, 2004, Stanfield hired Milbank, Tweed, Hadley & McCloy LLP ("Milbank") to analyze the credit agreements related to that debt, as well as the intercreditor agreement between the first and second lenders (collectively, the "Credit Documents"). The analysis was for the purpose of identifying provisions that might affect the second lien lenders' plan to provide additional financing to the Debtors secured by first-priority liens in accounts receivable.  Stanfield paid Milbank $24,840 for its services and related expenses.

In April 2005, in anticipation of filing bankruptcy, the Debtors obtained a commitment for a debtor-in-possession credit facility that would pay off the first lien debt in full (the "Take-Out Facility").  Although the agent for the first lien lenders had obtained counsel in anticipation of the Debtors' bankruptcy, an informal committee of holders of only first lien debt (the "FLC") was formed because some of the first lien lenders, including Stanfield, also owned second lien debt.  The FLC retained Milbank on April 22, 2005, to advise it with respect to intercreditor issues that might arise if the Take-Out Facility was not approved by the Court.

The Debtors filed these bankruptcy cases on April 26, 2005. The Court entered orders approving the Take-Out Facility on an interim basis on April 27 and May 27, 2005.  The Debtors were

unable to meet the conditions necessary to obtain final approval,
however, and were forced to seek alternative financing that would
leave intact (and prime) both tranches of pre-petition secured
indebtedness (the "Priming Facility").  On June 30, 2005, the
Court entered an order approving the Priming Facility (the "Final
DIP Order").  Milbank continued to represent the FLC on the
intercreditor issues after entry of the Final DIP Order.

On February 13, 2006, Stanfield filed the instant motion to
disqualify Milbank from further representation of the FLC.
Milbank filed an objection to the motion, under seal, on March 3.
On March 7, the Court held an evidentiary hearing but reserved
ruling on the motion pending the parties' stipulation to trial
exhibits and submission of supplemental briefs.  The Court has
reviewed those briefs and the trial record.  This matter is ripe
for decision.


II.  JURISDICTION

Stanfield's motion to disqualify Milbank is a core
proceeding over which the Court has jurisdiction pursuant to 28
U.S.C. § 157(b)(2)(A).  See, e.g., Century Indem. Co. v.
Congoleum Corp. (In re Congoleum Corp.), 426 F.3d 675, 686 (3d
Cir. 2005) ("[O]ne of the inherent powers of any federal court is
the admission and discipline of attorneys practicing before
it."); In re Johore Inv. Co., 157 B.R. 671, 674 (D. Haw. 1985)

3

("[A] motion to disqualify counsel of a major secured creditor is
a matter integrally tied to the administration of the estate, and
disposing of such a motion is clearly a necessary function of the
bankruptcy judge in presiding over the orderly administration of
the estate.")


III. <u>DISCUSSION</u>

The Model Rules of Professional Conduct of the American Bar
Association (the "Model Rules") govern the practice of law before
this Court.[2]  Del. Bankr. L.R. 1001-1(b) (adopting the Local
Rules of Civil Practice and Procedure of the United States
District Court for the District of Delaware); D. Del. L.R.
83.6(d)(2) (incorporating the Model Rules).  For conduct
inconsistent with the Model Rules, an attorney "may . . . be
reprimanded or subjected to other such disciplinary action as the
circumstances may warrant."  D. Del. L.R. 83(6)(d)(1).

A.    <u>Rule 1.7 - Concurrent Conflict of Interest</u>

Stanfield argues that Milbank's representation of the FLC is
prohibited by Model Rule 1.7(a), which provides that "a lawyer
shall not represent a client if the representation of . . .
[that] client will be directly adverse to another client."

---

[2]  Stanfield styles its motion as one arising under Delaware
state law, a harmless error given Delaware's adoption of the
relevant Model Rules.

According to Stanfield, Milbank continues to represent it because Stanfield never terminated Milbank's engagement and Milbank never withdrew from the representation.  Consequently, Stanfield argues, Milbank's representation of the FLC, whose interests are directly adverse to those of Stanfield, creates a concurrent conflict of interest prohibited by Model Rule 1.7.

Milbank argues that Stanfield terminated Milbank's engagement and, therefore, Model Rule 1.7 is inapposite.  In an e-mail exchange in early March, 2005, Stephen Blauner, the Milbank partner responsible for Stanfield, asked Christopher Pucillo, the fund manager in charge of Stanfield's Meridian investments, whether Stanfield planned to utilize Milbank for the Debtors' impending bankruptcy cases.  Blauner stated that he would be leaving Milbank to pursue other opportunities in June, 2005, but that he "would be happy to hand off" the matter to another Milbank attorney.  Pucillo responded, "The consensus was that [Milbank] was going to be too busy . . . . so we really just decided to move on."  He said the decision had been made without him but he did not disagree.  He also stated he would only "push back" if he "knew [he] could have [Blauner] working on it."  (Ex. M-13.)

Pucillo testified that the "we" to whom he referred was not Stanfield, but rather the second lien lenders in general, whose agent had already obtained other counsel for these cases.

Pucillo testified further that he did not intend to terminate Milbank's engagement.

Pucillo's testimony is not credible.  If Pucillo had intended to utilize Milbank's services, he naturally would have said so in response to Blauner's open-ended inquiry.  Further, Pucillo made clear in his e-mail that he was not interested in retaining Milbank unless Blauner was there.  Blauner understood this to mean that Stanfield had decided not to utilize Milbank in the Debtors' cases.  (TR. at 284.)

Therefore, the Court finds that Stanfield terminated the attorney-client relationship with Milbank almost two months before Milbank undertook the FLC representation.  Consequently, the Court concludes that Model Rule 1.7 is not implicated.

B.    Rule 1.9 - Duties to Former Clients

In the alternative, Stanfield argues that Milbank violated a duty owed to it as a former client under Model Rule 1.9(a).  That Rule provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Model R. Prof'l Conduct 1.9(a).

Stanfield argues that the intercreditor issues for which it retained Milbank are the same as those arising in these cases since the collapse of the Take-Out Facility.  Accordingly,

6

Stanfield contends that Milbank needed its written consent to the FLC representation, which Milbank neither sought nor obtained.

Milbank concedes that the interests of Stanfield and the FLC are materially adverse and that it never sought Stanfield's consent to the FLC representation.  It denies, however, that the Stanfield and FLC representations concern the same or substantially related matters.  Further, even if the matters are related, Milbank argues that Stanfield consented to its representation of the FLC.

        1.   <u>Same or Substantially Related Matter</u>

The Model Rules do not define what constitutes a "matter" for conflict-of-interest purposes.  Comment 2 to Model Rule 1.9, however, provides:

> The scope of a "matter" . . . depends on the facts of a particular situation or transaction.  The lawyer's involvement in a matter can also be a question of degree.  When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests in that transaction clearly is prohibited. . . .  The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

Model R. Prof'l Conduct 1.9, cmt. [2].

According to Stanfield, the Debtors' pre-petition debt structure was the "matter" for which it and the FLC hired Milbank.  Because each client's ultimate purpose was to maximize its position vis-à-vis the other tranche of lien creditors,

7

Stanfield believes Milbank has a conflict.

According to Milbank, the Stanfield representation concerned a discrete refinancing transaction (the accounts receivable facility) that was mooted by the Debtors' bankruptcy filing.  The FLC representation, on the other hand, concerns intercreditor issues arising within the bankruptcy cases and is totally independent of Stanfield's pre-bankruptcy refinancing plans, according to Milbank.  Although the Credit Documents are common to both representations, Milbank insists the representations are factually distinct and that it did not "change sides."

The Court disagrees.  While Stanfield's immediate objective in hiring Milbank was to implement the proposed receivables facility, its ultimate objective was to protect its second-lien position.  Indeed, Blauner believed he "was representing Stanfield in connection with Meridian."  (TR. at 282 (emphasis added).)  This is probably why he felt he "had to ask" Pucillo about Stanfield's plans when Milbank started to get calls from other parties in the case.  (Ex. M-13.)

Moreover, the work done by Milbank for Stanfield reflects the broad scope of the engagement.  In its memorandum outlining the steps necessary to implement the proposed receivables facility, Milbank acknowledged that many of the concepts were "also relevant to any liquidity facility that might be considered for Meridian."  (Ex. M-4 (emphasis added).)  This would include

8

the Priming Facility under which the Debtors are currently operating.  Furthermore, Milbank reviewed all the Credit Documents and produced a chart which identified questions that Stanfield, as a second lien creditor, should explore.  (Ex. M-5.) Milbank also provided answers (i.e., legal advice) to those questions, explaining how Stanfield could protect its position. Milbank described this work as "a matrix containing our <u>analysis</u> of the various <u>intercreditor issues</u> arising in respect of the first- and second-lien loan positions for Meridian."  (Ex. M-5 (emphasis added).)  The legal advice which Milbank is now providing to the FLC concerns the same intercreditor issues, only this time Milbank is advising the first lien creditors how to protect themselves from the second lien creditors, including Stanfield.

Milbank obviously cannot advise each tranche of secured debt holders as to its rights vis-à-vis the other under the Credit Documents without "changing sides in the matter in question." <u>See, e.g.</u>, <u>Milbank, Tweed, Hadley & McCLoy v. Boon</u>, 13 F.3d 537, 543 (2d Cir. 1994) (affirming judgment against Milbank for breach of duty to former client where Milbank "pursue[d] on behalf of [its subsequent client] an amendment to the same transaction that it had previously negotiated on behalf of [the former client.]"). Accordingly, the Court concludes that the FLC and Stanfield representations concerned the "same matter" under Model Rule

1.9(a).

Milbank resists this conclusion and draws the Court's attention to cases discussing the "substantially related" prong of Model Rule 1.9(a).  See, e.g., Integrated Health Servs. of Cliff Manor, Inc. v. THCI, Co., 327 B.R. 200, 206-07 (D. Del. 2005); Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington, 652 F. Supp. 1281, 1283 (D. Del. 1987).  According to Milbank, the sole purpose of Model Rule 1.9 is to protect client confidences.  Milbank alleges that it did not obtain any confidential information from Stanfield.  Therefore, Milbank argues Model Rule 1.9(a) is not implicated.

Preliminarily, Milbank is mistaken about the relevant legal standard.  Matters are "substantially related" under Model Rule 1.9(a) "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  Model R. Prof'l Conduct 1.9, cmt. [3] (emphasis added).  Thus, while the risk of a breach of client confidences is a sufficient condition for "relatedness," it is not a necessary one.  Accord Del-Chapel Assocs. v. Ruger, C.A. No. 16942, 2000 WL 488562, at *5 (Apr. 17, 2000) ("[D]isqualification may be proper even if access to the former client's confidential information is not a concern.")

10

This makes sense in light of the three distinct purposes of
Model Rule 1.9:

> First, it is a prophylactic rule to prevent even the
> potential that a former client's confidences and
> secrets may be used against him.  Without such a rule,
> clients may be reluctant to confide completely in their
> attorneys.  Second, the rule is important for the
> maintenance of public confidence in the integrity of
> the bar.  Finally, and importantly, <u>a client has a
> right to expect the loyalty of his attorney in the
> matter for which he is retained</u>.

<u>In re Corn Derivatives Antitrust Litigation</u>, 748 F.2d 157, 162
(3d Cir. 1984) (emphasis added).

Representing an adverse party in the same transaction or
legal dispute frustrates the former client's expectation when
seeking legal representation that "his attorney will never be
found helping the other side."  ABA Comm. on Ethics and Prof'l
Responsibility, Informal Op. 1157 (1970).  <u>See also</u> <u>Corn
Derivatives</u>, 748 F.2d at 161 (recognizing a "duty of continuing
loyalty" to former clients).  This is so whether or not the
attorney also violates the duty of confidentiality in the
process.  The Court finds that Milbank's representation of
Stanfield and the FLC with respect to the <u>same</u> loan documents
raises duty-of-loyalty concerns that are alone sufficient to
support a violation of Model Rule 1.9.

Even if confidentiality concerns were a necessary rather
than sufficient condition for relatedness, however, Milbank's
belief that it does not possess confidential information about

Stanfield is also mistaken.  Milbank insists that the only
information it received from Stanfield was the content of the
Credit Documents, which were not proprietary to Stanfield and, in
fact, were already accessible by the FLC.

This misses the point.  The duty of confidentiality "applies
not only to matters communicated in confidence by the client but
also to <u>all information</u> relating to the representation, <u>whatever
its source</u>."  Model R. Prof'l Conduct 1.6, cmt. [3] (emphasis
added).  Milbank's own legal conclusions about the Credit
Documents and advice to Stanfield are particularly confidential.

Knowledge of this confidential information could[3] materially
advance the FLC's position by giving it a head start in assessing
the intercreditor issues arising under the Credit Documents and
revealing precisely what Stanfield perceived to be the strengths
and weaknesses of its own position.  <u>See</u> <u>Webb v. E.I. DuPont de
Nemours & Co.</u>, 811 F. Supp. 158, 162 (D. Del. 1992) ("Adverse use
of confidential information is not limited to disclosure.  It
includes knowing . . . what lines of attack to abandon and what
lines to pursue, what settlements to accept and what offers to
reject, and innumerable other uses.").  This is particularly
relevant here because the parties are currently embroiled in
intense negotiations about the Debtors' plan of reorganization.

---

[3]  Although none of the attorneys who worked on the Stanfield
matter appear to be involved in the FLC representation, the
conflict of one attorney is imputed to the firm.  Model R. Prof'l
Conduct 1.10.

12

Accordingly, the Court concludes that, even if the Stanfield and FLC matters are not "the same," they are "substantially related" under Model Rule 1.9(a).

### 2.  Informed Consent, Confirmed in Writing

To represent the FLC, Milbank needed Stanfield's informed consent, confirmed in writing.  Model R. Prof'l Conduct 1.9(a). Under the Model Rules, "informed consent" denotes "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  Model R. Prof'l Conduct 1.0(e). The lawyer "need not inform [the] client . . . of facts or implications already known to the client."  Id., cmt. [6].

### a.  Express Consent

Milbank argues that Stanfield affirmatively consented to the FLC representation, in writing, through Pucillo's March 4, 2005, e-mail to Blauner.  (Ex. M-13.)  Pucillo has substantial experience in bankruptcy matters.  Accordingly, Milbank argues, Pucillo "understood the implications" of being told by Blauner that Milbank was getting calls about the Debtors' cases. According to Milbank, Pucillo's response that Stanfield had "decided to move on" amounted to consent to Milbank's retention by another in these cases.

13

The Court disagrees.  Pucillo's statement merely terminated
the attorney-client relationship.  Blauner testified that was his
understanding of the e-mail exchange.  (See TR. at 284-85.)
Although termination of the attorney-client relationship meant
Milbank was free to represent other creditors in these cases, it
did not mean Milbank was free to advise other parties to the
Credit Documents, who are directly adverse to Stanfield, on
intercreditor issues.

Moreover, even if Pucillo had intended to consent to other
representations, such consent was not effective because Blauner's
reference to "calls" was not adequate to inform Pucillo that the
FLC was among Milbank's potential suitors.  See Model R. Prof'l
Conduct 1.7, cmt. [22] ("If . . . consent [to a future conflict]
is general and open-ended, then the consent will ordinarily be
ineffective, because it is not reasonably likely that the client
will have understood the material risks involved.").  Indeed, at
the time of the March e-mail exchange, Blauner was in no position
to inform Pucillo of this possibility because the FLC had not yet
been formed.

     b.    Implied Consent

Milbank argues that, even if Stanfield did not affirmatively
consent to Milbank's representation of the FLC, it implicitly
consented by failing to bring the conflict to Milbank's attention
within a reasonable time.  While "[o]btaining informed consent

will usually require an affirmative response by the client," consent "may be inferred . . . from the conduct of a client . . . who has reasonably adequate information about the matter."  Model R. Prof'l Conduct 1.0(e), cmt. [7].

This argument is unconvincing.  Milbank was already representing the FLC when Stanfield received notice of the engagement.  Thus, Milbank had already violated Model Rule 1.9 by the time Stanfield could have raised the issue.  See, e.g., Pennwalt Corp. v. Plough, Inc., 85 F.R.D. 264, 273 (D. Del. 1980) ("[T]he duty is upon the attorney to ferret out . . . conflicts, and not upon the client to divulge them.").

Furthermore, Stanfield did bring the conflict to Milbank's attention within a reasonable time.  On June 24, 2005, Pucillo and Andrew Siegel, Stanfield's general counsel, phoned Warren Cooke, co-chair of Milbank's Risk Management Committee, and voiced their concern that the FLC representation was inappropriate.  (See Ex. M-43.)  Based on his own review of Milbank's files and billing records, Cooke took the untenable position that the FLC and Stanfield matters were "basically unrelated" and that Milbank did not need Stanfield's consent to the representation.

Milbank does not contend that it would have taken a different position if Stanfield had raised the issue earlier. Consequently, Stanfield's delay of two months in raising the

15

conflict was immaterial.  It was also understandable.  Approval of the Take-Out Facility would have mooted any conflicts by eliminating the first lien debt.  Thus, the conflict had not fully ripened until the Take-Out Facility collapsed and the Priming Facility was proposed.  It was not unreasonable for Stanfield to wait until that time to raise the issue with Milbank.

Milbank argues further that the Final DIP Order was a "writing" which confirmed such implied consent because it authorized the payment of Milbank's fees for representing the FLC to which Stanfield did not object.  The Final DIP Order requires that the Debtors pay, as adequate protection for the FLC members, (1) up to $250,000 of Milbank's reasonable fees and expenses incurred prior to the Final DIP Order, and (2) "the reasonable fees and expenses of . . . one law firm (if any) as counsel" for the FLC with respect to "intercreditor issues."

Milbank's assertion that the Final DIP Order constitutes written evidence of Stanfield's consent is unconvincing.  The Court's Final DIP Order does not qualify as a "confirmatory writing" under Model Rule 1.9 because it was neither "given by" Stanfield nor "transmitted by" Milbank.  See Model R. Prof'l Conduct 1.0(b).  Significantly, nothing in the Final DIP Order mentions Milbank's conflict of interest or Stanfield's consent thereto.  In fact, the Court was unaware of the conflict until

Stanfield filed its disqualification motion in February, 2006.

Accordingly, the Court finds that Stanfield did not consent to Milbank's representation of the FLC.  Because that representation was adverse to Stanfield in a matter in which Milbank had represented Stanfield, the Court concludes that Milbank violated Model Rule 1.9.

C.   Waiver

Milbank argues, nonetheless, that Stanfield waived any right to seek disqualification by waiting to file its motion eight months after learning that Milbank refused to withdraw.  See, e.g., Trust Corp. of Montana v. Piper Aircraft Corp., 701 F.2d 85, 87 (9th Cir. 1983) (holding that waiver is appropriate where a former client has a valid ground for disqualification but "knowingly refrains from asserting it promptly").  Milbank insists this delay was purely tactical, designed to deprive the FLC of its counsel of choice at a crucial point in these cases.

The Court is more concerned with Milbank's conduct than Stanfield's alleged motive in bringing this motion.  The Court's "supervision of the ethical conduct of attorneys practicing before it is designed to protect the public interest and not merely the interest of the particular moving party."  INA Underwriters Ins. v. Nalibotsky, 594 F. Supp. 1199, 1203 (E.D. Pa. 1984).  Moreover, "[r]ules governing professional conduct are often viewed as even more necessary and applicable in bankruptcy

17

cases than in other contexts." <u>Congoleum</u>, 426 F.3d at 686.  The
rules are so important that courts may act <u>sua sponte</u> to enforce
them.  <u>O'Connor v. Jones</u>, 946 F.2d 1395, 1399 (8th Cir. 1991).

Consequently, the Court would not find a waiver by Stanfield
unless it is clearly warranted by the facts.  In this case it is
not.  Stanfield complained to Milbank of its representation of
the FLC beginning in June.  When its efforts did not result in
Milbank withdrawing, Stanfield hired counsel who made similar
efforts to resolve the issue.  Only when those efforts were
unsuccessful did Stanfield file the instant Motion.  Given
Stanfield's continued insistence that there was a conflict,
Milbank could not have believed that Stanfield waived the
conflict.

D.   <u>Disqualification</u>

Milbank argues that it should not be disqualified because,
in arriving at the conclusion that the FLC representation was
appropriate, Cooke relied in good faith on the opinion of
Blauner, the former chair of Milbank's Risk Management Committee
and an expert on legal ethics in the state of New York.

The Court is not convinced.  Blauner's "opinion" on which
Milbank relied was but one of several hypotheticals that he
posited in his "Conflicts Kindergarten" presentation to the Risk
Management Committee prior to his departure.  It borrowed some
facts from the Stanfield and FLC representations, but differed in

18

two important respects.  First, it did not take into account that

"intercreditor issues" were a common thread between the two

representations.  Second, it posited that Milbank had obtained a

written waiver from Stanfield.  Had Cooke investigated the facts

adequately, e.g. by consulting with Blauner and the attorneys

working on the FLC matter, he would have discovered these

discrepancies.

Milbank argues finally that the prejudice to the FLC if it

is deprived of its counsel of choice outweighs any prejudice to

Stanfield if the representation were to continue.  The Court

acknowledges that Milbank's disqualification may adversely affect

the FLC.  However, parties

> do not have an absolute right to retain particular
> counsel.  The plaintiffs' interest in retaining counsel
> of its choice and the lack of prejudice to IBM
> resulting from [counsel's] violation of professional
> ethics are not the only factors to be considered in
> this disqualification proceeding.  An attorney who
> fails to observe his obligation of undivided loyalty to
> his client injures his profession and demeans it in the
> eyes of the public.  The maintenance of the integrity
> of the legal profession and its high standing in the
> community are important additional factors to be
> considered in determining the appropriate sanction for
> a . . . violation [of the Model Rules].  The
> maintenance of public confidence in the propriety of
> the conduct of those associated with the administration
> of justice is so important a consideration that we have
> held that a court may disqualify an attorney for
> failing to avoid even the appearance of impropriety.
> Indeed, the courts have gone so far as to suggest that
> doubts as to the existence of an asserted conflict of
> interest should be resolved in favor of
> disqualification.

IBM Corp. v. Levin, 579 F.2d 271, 283 (3d Cir. 1978) (citations

19

omitted).

The Court has no difficulty concluding that, on balance, Milbank's violation of Model Rule 1.9 and dogged refusal to acknowledge the same warrant disqualification from further representation of the FLC in these cases.


IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant Stanfield's motion to disqualify Milbank from further representation of the FLC.

An appropriate order is attached.



By the Court,


Dated: April 17, 2006

Mary F. Walrath
United States Bankruptcy Judge