IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| MERIDIAN AUTOMOTIVE SYSTEMS | ) Case No. 05-11168 (MFW) |
| - COMPOSITES OPERATIONS, | ) |
| INC., <u>et al.</u>, | ) |
| | ) |
| Debtor. | ) |

_____

## OPINION[1]

Before the Court is the Motion of Meridian Automotive
Systems, Inc. ("Meridian") to Compel Compliance with the Terms of
the Critical Vendor Orders by which Meridian seeks an order
compelling Plastech Engineered Products, Inc. ("Plastech") to
disgorge $1.25 million which it received under the Critical
Vendor Orders.  Plastech opposes the Motion.  For the reasons
stated below and in the accompanying Findings of Fact, the Court
will grant the Motion.


I.    BACKGROUND

Meridian and Plastech are both automotive suppliers to the
Ford Motor Company ("Ford").  Meridian was the tier 1 supplier to
Ford of the bumper system for the Ford Expedition.  (FOF 3)  An

_____

[1]    This Opinion, and the accompanying Findings of Fact
("FOF"), constitute the findings of fact and conclusions of law
of the Court pursuant to Rule 7052 of the Federal Rules of
Bankruptcy Procedure, which is made applicable to contested
matters by Rule 9014.

essential component of the Expedition's bumper system is the U222 Fascia.  (FOF 4)  Meridian did not have the tooling necessary to produce U222 Fascias for the 2002-2006 Expedition model years.  (FOF 5)  Therefore, Meridian was required to utilize a tier 2 supplier to manufacture the U222 Fascias; Plastech ultimately became that supplier.  (FOF 6, 7)  Because Plastech was the supplier for the U222 Fascias, Meridian depended upon Plastech's timely delivery of the U222 Fascias in order to meet its obligations to Ford for the Expedition bumper system.  (FOF 14)

On April 26, 2005 (the "Petition Date"), Meridian and certain of its subsidiaries (collectively the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On that same day, Meridian filed the Motion of the Debtors for an Order Authorizing the Payment of Prepetition Claims of Critical Vendors and Service Providers (the "Critical Vendor Motion") which was granted on an interim basis on April 27, 2005, and by final order dated May 26, 2005 (collectively, the "Critical Vendor Orders").  (FOF 23, 24, 26)  The Critical Vendor Orders required that Meridian "undertake all appropriate efforts to cause each Critical Vendor to enter into" a Trade Agreement that included, inter alia, that the Critical Trade Vendor would be bound by the parties' Customary Trade Terms (including pricing).  (FOF 27)  The Critical Vendor Orders further provided that if a Critical Vendor subsequently refused to supply goods to

Meridian on Customary Trade Terms, the Critical Vendor would be required to repay any payment received in excess of the post-petition obligations owed to the Critical Vendor at that time. (FOF 27, 28)

On June 14, 2005, Meridian and Plastech entered into a Trade Agreement. (FOF 30) Meridian paid Plastech a total of $1.25 million of its pre-petition claim (the "Trade Payment"). (FOF 35) Pursuant to the Trade Agreement, Plastech agreed to supply Meridian with U222 Fascias. (FOF 37, 38)

A year later, in June 2006, Meridian was scheduled to cease production of the current model of the Expedition bumper system. (FOF 15) Meridian was, however, required thereafter to provide Ford with primed, unpainted service parts for those bumpers. (FOF 15) Under the Purchase Terms extant between the parties, Plastech was obligated to provide the U222 Fascias (including service and replacement parts) for ten years after production of the current model ceased, at the prices specified in the applicable Purchase Orders or Releases plus any actual cost differential for packaging (the "Production Price"). (FOF 16)

In January of 2006, Plastech advised Meridian that it would not supply U222 Fascia service parts once the model year production concluded in June 2006. (FOF 43) Meridian responded that Plastech was required by the parties' agreement to produce the service parts. (FOF 44) The issue was not resolved until

3

the parties had a meeting with Ford in May at which time Plastech confirmed that it would provide service parts.  (FOF 45)

In early July 2006, Plastech twice demanded price increases for the service parts: a 200% price increase and a 50% price increase.  (FOF 48)  Plastech stated that it would not ship the U222 Fascia service parts until it received a price increase.  (FOF 49)  When Meridian rejected Plastech's demands for price increases, Plastech failed to ship any U222 Fascias to Meridian during the months of July and August 2006.  (FOF 50, 51)

As a result of Plastech's failure to ship, Meridian asked Plastech to return the tooling necessary to produce the U222 Fascias, after Plastech had first built a bank of excess parts so that delivery to Ford would not be disrupted during the tool transfer process.  (FOF 52)  In response, Plastech wrote that it would continue to ship service parts at production prices for ninety days, but only if Meridian agreed to waive any preference claims it had against Plastech.  (FOF 53)  Meridian refused and on September 5, 2006, wrote a letter to Plastech asserting that "Plastech's refusal to supply service parts to Meridian in accordance with the terms of the Purchase Order constitutes a willful breach of Plastech's obligations to Meridian under the Critical Vendor Agreement" and "[a]s a result of such breach, pursuant to paragraph 5 of the Critical Vendor Agreement, Plastech is obligated to immediately return the [Trade] Payment

4

to Meridian." (FOF 54, 55)

Plastech responded on September 7, 2006, by acknowledging its contractual obligation to supply service parts to Meridian at production prices and stating that Plastech remained committed to honoring its obligations. (FOF 57) Thereafter, Plastech resumed supplying parts to Meridian. Although Plastech continued to acknowledge its responsibility to deliver parts to Meridian, it did not fully perform its obligations and was constantly behind in deliveries to Meridian between September and December of 2006. (FOF 62-83) As a result of Plastech's failure to perform, Meridian was unable to supply an adequate number of bumper assemblies to Ford. (FOF 80, 83-85) Meridian continually complained to Plastech about its poor performance, asked it to comply with its obligations, and advised Plastech that it would pursue its legal rights if Plastech did not perform. (FOF 71, 72, 75, 79)

In December 2006, following months of discussions among Meridian, Ford and Plastech regarding Plastech's repeated failure to deliver parts, Plastech agreed to transfer all the tooling necessary to manufacture the U222 Fascias to Meridian. (FOF 86-88) On December 13, 2006, Plastech confirmed this agreement in writing. (FOF 88) The transfer of the tooling was completed and the Trade Agreement was mutually terminated by the parties on December 22, 2006. (FOF 90, 91)

In the interim, on December 6, 2006, the Court confirmed the
Fourth Amended Joint Plan of Reorganization of the Debtors (the
"Plan"), which became effective on December 29, 2006.  (FOF 93,
94)  In the Plan, Meridian assumed all its executory contracts or
unexpired leases as of the Effective Date unless they were
previously assumed, rejected, terminated, or expired.  (FOF 98)
In the Plan, Meridian also reserved causes of action it had
against vendors, including specifically Plastech.  (FOF 95-97)

On January 19, 2007, Meridian wrote to Plastech demanding
that it immediately repay the Trade Payment because of its
failure to abide by the terms of the Trade Agreement.  (FOF 100)
When Plastech refused to return the Trade Payment, Meridian filed
the Compliance Motion on January 23, 2007.  (FOF 101)  An
evidentiary hearing was held on the Motion on April 11, 2007.
(FOF 103)  Post trial briefs and Proposed Findings of Fact and
Conclusions of Law were filed by the parties on May 10, 2007.
(FOF 104)  The matter is ripe for decision.


II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this
contested matter pursuant to 28 U.S.C. §§ 157 & 1334.
Jurisdiction was reserved under the Trade Agreement and the Plan.
(FOF 34, 99)  Venue is proper in this district pursuant to 28
U.S.C. §§ 1408 & 1409.  This matter is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (L), & (O).

III. <u>DISCUSSION</u>

Meridian argues that Plastech is in breach of the Trade Agreement and, consequently, is obligated to return the Trade Payment under the terms of the Critical Vendor Orders.  Plastech counters that (1) it did not breach the terms of the Trade Agreement, (2) Meridian failed to provide the requisite notice of default to terminate the Trade Agreement and has waived any default by Plastech, and (3) recoupment of the Trade Payment is precluded by confirmation of the Plan.

A.   <u>Breach of Contract</u>

Meridian asserts that Plastech breached the Trade Agreement and accordingly must repay the Trade Payment.  Meridian argues that Plastech, upon acceptance of the Trade Payment, became obligated to continue to supply product to Meridian during the bankruptcy case on the parties' Customary Trade Terms.  Specifically, Meridian contends that those terms required Plastech to supply service parts at production prices on a timely basis.  Because Plastech refused to do so, Meridian asserts that it must repay the Trade Payment.  Meridian relies on the Critical Vendor Orders which provided:

> If a Critical Vendor who has received payment of a prepetition claim subsequently refuses to supply goods to [Meridian] on Customary Trade Terms, any payments received by the Critical Vendor on account of its

7

```
Critical Vendor Claim will be deemed to have been in
payment of then outstanding post-petition obligations
owed to such Critical Vendor, and that such Critical
Vendor shall immediately repay to [Meridian] any
payments received on account of its Critical Vendor
Claim to the extent that the aggregate amount of such
payments exceed the post-petition obligations then
outstanding, without the right of setoff or
reclamation.
```

(FOF 27)

>    1.   Demands for Price Increase

Meridian argues that Plastech did not abide by the parties'
Customary Trade Terms but instead wrongfully demanded price
increases.

Plastech responds that it was permitted under the parties'
Customary Trade Terms to request a price increase.  Plastech
notes that neither the Critical Vendor Orders nor the Trade
Agreement expressly stated the actual price at which the product
was to be sold or that prices could not be renegotiated.
Further, Plastech asserts that Meridian admitted that nothing in
the Trade Agreement locked in the price terms because price
negotiations were within the ordinary course of business.  (Exs.
P-29 & P-30; Tr. at 98:2-102:3)  Plastech contends that the
parties' previous agreement to a price decrease (in 2004)
evidences their intent to have future price adjustments.  (Tr. at
58:5-15; Ex. J-15)  In addition, Plastech notes that Meridian
asserted post-petition that it was entitled to a price reduction,
notwithstanding the Trade Agreement and Critical Vendor Orders.

(Exs. P-29 & P-30; Tr. at 98:2-102:3)   Thus, Plastech argues that the Customary Trade Terms and the Trade Agreement did not prohibit Plastech from requesting a price increase.

The Court disagrees.  The Trade Agreement required that during the course of the bankruptcy case Plastech provide Meridian with product at the same prices that had been in effect for 120 days before the Petition Date.  In this respect, the Critical Vendor Orders provided that the Trade Agreement shall include:

> (b) The Critical Vendor's agreement to be bound by the Customary Trade Terms (including, but not limited to, credit limits, <u>pricing</u>, cash discounts, timing of payments, allowances, rebates, coupons reconciliation, normal product mix and availability, and other applicable terms and programs), <u>which were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis for the period within one-hundred twenty (120) days of the Petition Date, or such other trade terms as mutually agreed to by the Debtors and such Critical Vendor.</u>

(Exs. J-6 at pp. 2-3, J-7 at p.3, J-12 at p. 3 (emphasis added))

Plastech's request for a price increase was exactly what the Trade Agreement and Critical Vendor Orders sought to bar.  Thus, the Court concludes that Plastech's insistence on a price increase (after it was refused by Meridian) was a violation of the Trade Agreement and the Critical Vendor Orders.

The fact that Meridian had requested a price adjustment earlier is not conclusive because that price adjustment was not granted.  In fact, in response to Meridian's request, Plastech

took the position that no price adjustment was permitted under the Trade Agreement and Critical Vendor Orders. (FOF 41) The Court agrees with Plastech's interpretation at that time and concludes that Plastech's requested price increase was not permissible under the terms of the Trade Agreement and the Critical Vendor Orders.

### 2. Refusal to Deliver in July/August

Even if Plastech were correct and it was permitted to ask for price increases, Meridian contends that Plastech's refusal to ship product for two months when Meridian rejected the requested price increases did violate the Trade Agreement and the Critical Vendor Orders.[2]

Plastech has admitted that it did not deliver any product during those months. (FOF 51) Plastech contends, however, that it was not required to deliver any product, because under the parties' Customary Trade Terms Plastech had no obligation to fulfill any release until it accepted that release (by beginning performance). (Ex. J-10 at § 1(a); Tr. at 9:14-10:2) Plastech asserts that it did not accept any of the releases issued by Meridian in July and August for fear that it would be an acceptance of the pricing. (Ex. J-10 at § 1(b))

---

[2] Meridian notes that when its request for a price decrease was refused by Plastech, Meridian did not refuse to pay Plastech or breach its other obligations under the Trade Agreement.

Meridian argues that, while that may have been the parties' arrangement pre-petition, once Plastech executed the Trade Agreement it became obligated to accept and perform all future releases issued by Meridian.

The Court agrees with Meridian.  The Critical Vendor Orders provided that Plastech had to agree to provide goods to Meridian on the Customary Trade Terms.  (FOF 27)  The Trade Agreement provided the same.  (Ex. J-12)  Plastech's witnesses testified that they understood that by executing the Trade Agreement and accepting the Trade Payment, Plastech was obligated to deliver product upon receipt of future Releases.  (FOF 37, 38) Therefore, the Court concludes that Plastech was required to perform the Releases issued by Meridian during the months of July and August.

Plastech argues nonetheless that after Meridian's September 5 letter asserting that Plastech was in breach of the Trade Agreement, Plastech cured the defaults by (1) providing written confirmation, by letter dated September 7, 2006, of its commitment to honor its contractual obligation to supply products at production prices and (2) resuming shipments of products to Meridian at production prices.

The Court finds that Plastech's promises of future performance were insufficient to excuse its failure to deliver product in July and August.  Further, Plastech failed to fulfill

11

its promises to perform in the future.  Specifically, Plastech
failed to immediately ship the product that had been ordered in
July and August.  Under the Purchase Terms which were
incorporated into the Trade Agreement, Plastech was given thirty
days to cure a default after getting notice thereof.  (J-10 at
§ 22(b))  Plastech sought to establish in its post-trial
submission that between September 7 and October 3, 2006, it
delivered all the outstanding orders from July and August.
(Plastech Proposed Finding of Fact 36)  That chart fails to note,
however, that each of the releases on which Plastech relies show
that as of late September and early October Plastech was still
behind by more that 2,000 parts.  (Exs. P-5 to P-15)  Those
releases establish that while Plastech may have delivered enough
product to satisfy the orders for July and August, it did not
also deliver enough product to satisfy the current orders.

Consequently, the Court finds that Plastech's refusal to
ship product in July and August, 2006, was a violation of the
Trade Agreement and Critical Vendor Orders which Plastech did not
cure.

### 3.   <u>Subsequent Failures to Deliver</u>

Meridian contends that even ignoring the refusal to ship in
July and August, Plastech subsequently continued to violate the
parties' Customary Trade Terms.  Between September 8 and December
11, 2006, Plastech became even more delinquent in deliveries.

12

Thus, Meridian argues that because Plastech failed to deliver
parts timely after September 7, 2006, Plastech violated the Trade
Agreement and the Critical Vendor Orders and is required to
return the Trade Payment.

Plastech responds that its failure to adequately supply
products to Meridian after September 7, 2006, is excusable under
the parties' Customary Trade Terms.  In support, Plastech cites
the Purchase Terms (incorporated into the Trade Agreement) which
state that Plastech is not "liable for a failure to perform that
arises from causes or actions beyond its reasonable control and
without its fault or negligence . . . ."  (J-10 at § 19)
Plastech argues that it was unable to supply all parts ordered in
the fall of 2006 because Meridian requested a significantly
greater number of parts from Plastech, in an attempt to build a
"bank" of product.  (It submitted charts of information taken
from the releases issued by Meridian to evidence this increase in
orders.)  Thus, Plastech argues it cannot be liable for its
failure to supply product after September 7, 2006.

Meridian disputes Plastech's contention (and "proof") that
Meridian ordered more parts than it needed in the fall of 2006.
It argues that the charts which Plastech prepared do not include
all the parts ordered by Meridian in 2005 and 2006.
Specifically, the charts do not include all the primed U222
Fascias that Meridian ordered in 2005 during the current model

13

year.  Therefore, they do not demonstrate that Meridian ordered

more parts in 2006 than in 2005 in order to build a bank of

parts.

The Court finds Plastech did not perform its obligations

under the Trade Agreement and Critical Vendor Orders after

September 2006.  In fact, by the end of December 2006, Plastech's

shipments not only were insufficient to cure the defaults but did

not come close to fulfilling new orders.  (FOF 64, 65, 67, 68,

73, 74, 80, 81)  For example, on September 8, 2006, Plastech was

behind by 5,300 parts while by December 5, 2006, Plastech was

behind by more than 9,500 parts.  (FOF 67, 81)  In fact, Plastech

admitted that it lacked the capacity to service Meridian during

this period.  (FOF 76, 77)

Further, the Court concludes that Plastech did not have a

valid excuse for its failure to perform.  Specifically, the Court

finds that the evidence does not demonstrate a significant

increase in orders by Meridian during this period.  (FOF 60, 61)

While Plastech sought to show this was done by the increase in

orders for service parts (as opposed to the prior year), this is

understandable given the fact that production parts were no

longer being made and orders were being placed only for service

parts.  Further, the Court finds the Meridian witnesses credible

when they testified unequivocally that there was not an effort to

build a bank of product but only to get the service parts that

14

were necessary to fill Ford's orders.  (FOF 60, 61)  Therefore,

the Court concludes that Plastech continued to violate its

delivery obligations under the Trade Agreement and the Critical

Vendor Orders after September 2006 and is obligated to return the

Trade Payment received by it.

      B.   <u>Termination of Trade Agreement</u>

     Plastech argues, however, that Meridian is not entitled to

repayment of the Trade Payment because Meridian was required to

terminate the Trade Agreement before it can recover the Trade

Payment.  Plastech notes that Meridian has admitted that it did

not terminate the Trade Agreement.  (Ex. J-5 at p.6)  Further,

Plastech asserts that the parties' continued performance of the

Trade Agreement through December 2006 proves that the Agreement

was not terminated by Meridian.

     Meridian responds that it did not admit that it did not

terminate the Agreement.  In its Response to Interrogatories,

Meridian simply stated that termination was not necessary.  (Ex.

J-5 at p.6)  Further, Meridian contends that it did provide the

required notice of Plastech's breach of the Trade Agreement in

its September 5, 2006, letter and, when Plastech did not cure the

breaches, the Trade Agreement was ultimately terminated by

consent of the parties in December 2006.

     The Court rejects Plastech's argument for two reasons.

First, the Critical Vendor Orders provide two instances under

which Plastech could be required to return the Trade Payment: (1) where its participation is terminated on notice from Meridian or (2) where it refuses to supply goods in accordance with the parties' Customary Trade Terms.[3]  The Trade Agreement provides the same two circumstances for return of the Trade Payment.[4]  As

---

[3]  In this regard, the Critical Vendor Orders state:

ORDERED, that the Debtors may, in their discretion, declare a Trade Agreement with an individual Critical Vendor to have terminated, together with the other benefits to the Critical Vendor as contained in this Order, on the date the Debtors deliver notice to the Critical Vendor that the Critical Vendor has not complied with the terms and provisions of the Trade Agreement or has failed to continue to provide Customary Trade Terms to the Debtors; and it is further
ORDERED, that if a Trade Agreement is terminated as set forth in either of the two previous paragraphs, or a Critical Vendor who has received payment of a prepetition claim later refuses to continue to supply goods to the Debtors on Customary Trade Terms during the pendency of these chapter 11 cases, the Debtors may, in their discretion, declare that provisional payments made to the Critical Vendor on account of prepetition Trade Claims be deemed to have been in payment of then outstanding post-petition amounts owed to such Critical Vendor without further order of the Court or action by any person or entity.  A Critical Vendor shall then immediately repay to the Debtors any payments made to it on account of its Critical Vendor Claim to the extent that such payments exceed the post-petition amounts then owing to such Critical Vendor, without the right of setoff or reclamation . . . .

(Exs. J-6 at pp. 3-4 & J-7 at pp. 3-4 (emphasis added))

[4]  The Trade Agreement provides:

that if Plastech's participation in the Trade Payment Program is terminated by the Company giving written notice to Plastech detailing Plastech's failure to

16

the Court found above, Plastech did refuse to supply goods to
Meridian in accordance with the parties' Customary Trade Terms
and is, therefore, required to return the Trade Payment.

In addition, the Court finds that Meridian has satisfied the
first requirement for return of the Trade Payment by giving
Plastech written notice on September 5, 2006, of Plastech's
defaults under the Trade Agreement.  (FOF 55)  Although Plastech
contends that it was entitled to thirty days to cure the default
under the parties' Customary Trade Practices, neither the Trade
Agreement nor the Critical Vendor Orders contain such a
provision.  In contrast, the Critical Vendor Orders provide that
the termination is effective on the date that the written notice
of the violation is given.  (FOF 28)  Accordingly, the Court
concludes that Plastech's participation in the critical vendor

---

comply with the terms of this Agreement (which Plastech
shall have the right to dispute), or if Plastech later
refuses to continue to supply goods and/or services to
the Company on Customary Trade Terms (as modified
herein) other than on account of the Company's failure
to pay Plastech in accordance with this Agreement, any
payments received by Plastech on account of its Trade
Claim, including the Initial Payment and the Final
Payment, will be deemed to have been in payment of then
outstanding post-petition obligations owed to Plastech,
and that Plastech will immediately repay to the Company
any payments made to Plastech on account of its Trade
Claim to the extent that the aggregate amount of such
payments exceeds the post-petition obligations then
outstanding, without the right of setoff or
reclamation.

(J-12 at p. 3)

17

trade program was terminated on September 5, 2006, when Meridian gave notice of its defaults under the Trade Agreement.

Even if Plastech were entitled to thirty days to cure the default, however, the Court has found above that Plastech failed to do so.  Although Plastech responded in writing that it was still willing to participate in the program, Plastech failed to cure the defaults and ultimately agreed to the termination of the Trade Agreement on December 22, 2006.  (FOF 57, 62-90)

Plastech argues nonetheless that the fact that the termination was consensual somehow precludes Meridian from seeking repayment of the Trade Payment.  It asserts that nothing in the Trade Agreement or the Critical Vendor Orders requires repayment of the Trade Payment upon a consensual termination of the Agreement.

Plastech's argument is not tenable.  The Trade Agreement and Critical Vendor Orders do require repayment of the Trade Payment if the Trade Agreement is terminated.  They make no distinction between consensual and non-consensual termination.  Plastech admits the Agreement was terminated.  Furthermore, although it was "consensual," the termination was the result of significant breaches by Plastech.  If Plastech's argument were correct, any defaulting critical vendor could avoid the penalty of returning its trade payment by consenting to termination of its trade agreement.  That is not what the Critical Vendor Orders or the

18

Trade Agreement provide.  Therefore, the Court concludes that
Meridian did terminate the Trade Agreement with Plastech in
accordance with the terms of the Trade Agreement and the Critical
Vendor Orders and Plastech is, accordingly, required to return
the Trade Payment.

     C.    <u>Waiver/Promissory Estoppel</u>

Plastech also argues that Meridian is estopped from
asserting (or has waived) the right to repayment of the Trade
Payment.  <u>See, e.g.</u>, <u>State Bank of Standish v. Curry</u>, 500 N.W.2d
104, 107 (Mich. 1993) (explaining that promissory estoppel
applies where (1) a party made a promise, (2) that it should have
reasonably expected would induce action or forebearance, and (3)
that did in fact induce such action or forebearance).

Plastech contends that in its September 5, 2006, letter
Meridian asserted that it would seek repayment of the Trade
Payment unless Plastech confirmed in writing its willingness to
continue to abide by the Trade Agreement and immediately honored
all outstanding releases.  Plastech argues that it did so and,
therefore, was led to believe that Meridian would not seek
repayment of the Trade Payment.  Further, Plastech asserts that
later in the fall it was led to believe that if it returned the
tooling, Meridian would not seek disgorgement of the Trade
Payment.  Plastech contends that to preserve its right to seek
repayment of the Trade Payment, Meridian had to state in writing

its intent to do so.

Meridian responds that there was no waiver by it of any rights.  It argues that the September 5 letter was clear that Meridian would enforce its rights and simply sought assurance from Plastech that it would comply with its contractual obligations.  Therefore, Meridian argues that promissory estoppel cannot apply.  See, e.g., Nassau Assocs. v. Crossland Fed. Sav. Bank, 169 B.R. 832, 842 (Bankr. S.D.N.Y. 1994) (holding that party cannot assert promissory estoppel as a result of being induced to perform existing contractual obligations).

Further, Meridian notes that it never advised Plastech that it would not seek reimbursement of the Trade Payment and, in fact, advised Plastech many times after September 5, 2006, that it had the right to seek repayment of the Trade Payment. Meridian notes that Plastech was represented by counsel at all relevant times and particularly during the negotiation of the agreement to return the tooling.

The Court agrees with Meridian that there was no waiver by it of its entitlement to return of the Trade Payment.  Plastech was represented by counsel and the claim for return of the Trade Payment is a significant one (in excess of $1 million).  If there were an agreement to waive it, the Court would have expected some written evidence to that effect.  There is none.  In fact, all evidence is to the contrary.  The evidence clearly establishes

20

that Meridian never agreed to a release of its rights but instead continually advised Plastech of its right to return of the Trade Payment. (FOF 55, 71, 72, 75, 79) Plastech's own witness admitted that Plastech never discussed or even asked for a release of Meridian's claim for disgorgement of the Trade Payment. (FOF 89) Significantly, Plastech had requested a waiver by Meridian of any potential preference claim, which Meridian refused to give. (FOF 53, 54) The December 6 letter confirming the agreement for return of the tooling and Plastech's December 13 acknowledgment of that deal, conspicuously fail to reference any release of Meridian's right to return of the Trade Payment in exchange for return of the tooling. (FOF 87-89)

The Court also disagrees with Plastech's contention that Meridian's communications led Plastech to believe that if it returned the tooling, Meridian would not pursue its legal remedies. Even if Plastech is correct and the September 5, 2006, letter was an offer to waive Meridian's right to seek disgorgement of the Trade Payment, that offer was contingent on Plastech actually performing its obligations under the Trade Agreement by assuring Meridian received a "continued and uninterrupted supply of service parts from Plastech at production prices." (FOF 56) Plastech did not do so. (FOF 64-83) Similarly, Meridian's October 9 e-mail requested "resumption of shipments and a plan that is actually followed to make

[Plastech's] shipments current to [Meridian's] releases." (FOF 72)  Plastech never provided Meridian with such a plan and did not become current between October and December when the Trade Agreement was terminated.  (FOF 73-83)  Consequently, even if Meridian's communications were a promise to waive its claim, Plastech's failure to perform precludes it from enforcing any such promise.  Therefore, the Court concludes that Meridian did not waive its right to seek repayment of the Trade Payment.

D.  <u>Assumption of Executory Contract</u>

Plastech argues that the Supply Agreement was an installment agreement under section 2-612 of the Uniform Commercial Code[5] which was executory as of the Petition Date under section 365 of the Bankruptcy Code.  Plastech contends that pursuant to section 6.1 of the Plan, all executory contracts which had not been rejected previously were assumed by Meridian as of the Effective Date.  (Ex. J-79 at § 6.1)  As a result, Plastech argues that even if it is required to return the pre-petition payment, Meridian would be obligated to pay those funds back to Plastech in order to cure Meridian's pre-petition defaults.  11 U.S.C. § 365(b)(1) (2005).[6]

---

[5]  Section 2-612(1) of the UCC defines an installment contract as "one which requires or authorizes the delivery of goods in separate lots to be separately accepted."  Mich. Comp. Laws § 440.2612 (2007).

[6]  Section 365(b)(1) states: "If there has been a default in an executory contract or unexpired lease of the debtor, the

Meridian responds that the Supply Agreement was not an executory contract as of the Petition Date.  It argues that the blanket Purchase Orders contained no obligation on the part of Meridian to order any parts or any obligation on the part of Plastech to deliver any parts.  See, e.g., Detroit Radiant Products Co. v. BSH Home Appliances Corp., 473 F.3d 623, 631 (6th Cir. 2007) ("A blanket purchase order does not oblige [the seller] to manufacture or ship any parts."); Urban Assocs., Inc. v. Standex Elecs., Inc., 216 F. App'x 495, 498 (6th Cir. 2007) ("A blanket order did not obligate the customer to buy any parts, and it did not obligate [the seller] to make or ship any parts . . . .").  Meridian contends that it was only on the issuance of a release that it became obligated to purchase parts from Plastech.  See Detroit Radiant Prods., 473 F.3d at 631 ("That obligation [to manufacture and ship goods] arises when [the buyer] issues what is known as a . . . release order that would issue against the blanket purchase order."); Urban Assocs., 216 F. App'x at 498 (same).

The Court disagrees with this argument of Meridian.  There were outstanding releases as of the Petition Date and, therefore, the Agreement was executory as of that date.  Further, many of

_____

trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee - (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ."  11 U.S.C. § 365(b)(1).

the releases issued post-petition were outstanding until the
parties terminated the Trade Agreement and contained material
obligations on both sides.  Meridian argued (in asserting that
Plastech breached the Trade Agreement) that Plastech was
obligated to perform under the Trade Agreement even in the
absence of its formal acceptance of a release, because of its
execution of the Trade Agreement.  Meridian cannot have it both
ways and now argue that the execution of the Trade Agreement and
issuance of releases thereunder did not create an obligation on
both parties to perform.  Therefore, the Court concludes that
there was an executory contract between the parties from the
Petition Date until the Trade Agreement was terminated.

     Even if the releases were executory, however, Meridian
asserts that as of the Effective Date, all obligations under the
outstanding releases had been fulfilled and the parties had
terminated the Trade Agreement.  Therefore, it contends that
there was no contract left to be assumed.  See, e.g., Sharon
Steel Corp. v. Nat'l Fuel Gas Distribution Corp., 872 F.2d 36, 39
(3d Cir. 1989) (adopting the Countryman definition of executory
contract in determining whether a contract was executory under
section 365 of the Bankruptcy Code); Countryman, Executory
Contracts in Bankruptcy, Part 1, 57 Minn. L. Rev. 439, 460 (1973)
(defining executory contract as "a contract under which the
obligation of both the bankrupt and the other party to the

contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.").

Plastech responds that the relevant date for determining if the contract was executory is the date the Plan was confirmed or December 6, 2006. At that time the Trade Agreement was still in existence. Plastech further contends that, even if the applicable date is the Effective Date, the parties still had ongoing obligations after the Trade Agreement was terminated because some of the tooling was not returned until after December 22, 2006.

The Court agrees with Meridian's contention that there was no contract to be assumed as of the Effective Date. The parties consensually terminated their Agreement on December 22, 2006, when the tooling was delivered to Meridian. (FOF 90, 91) Although some minor tooling had not been returned as of January 30, 2007, that did not represent a material obligation. Therefore, the Court concludes that as of the Effective Date (December 29, 2006) there remained no material obligation of either party under the Trade Agreement and therefore there was no executory contract to be assumed. See, e.g., Sharon Steel, 872 F.2d at 39; Countryman, Executory Contracts in Bankruptcy, Part 1, 57 Minn. L. Rev. 439, 460 (1973).

25

Because there was no executory contract between the parties
as of the Effective Date, the Trade Agreement was not assumed by
the terms of the Plan.  The Plan provided that only an executory
contract that had not been "previously expired or terminated
pursuant to its own terms" would be deemed assumed on the
Effective Date.  (FOF 98)  As found above, the termination of the
Trade Agreement was pursuant to the terms of that Agreement and
occurred before the Effective Date of the Plan.  Therefore, it
was not assumed by operation of the Plan.

     E.    <u>Res Judicata</u>

Plastech also argues that Meridian is precluded from seeking
repayment of the Trade Payment under the doctrine of <u>res
judicata</u>.  Plastech asserts that the Order confirming the Plan
was a final order in which both parties participated and which
adjudicated all issues which were raised or could have been
raised at the time.  <u>See, e.g.</u>, <u>Peltz v. Worldnet Corp. (In re
USN Commc'ns, Inc.)</u>, 280 B.R. 573, 586 (Bankr. D. Del. 2002) (<u>res
judicata</u> applies to any dispute which is subsequent to a final
judgment on the merits rendered by a court of competent
jurisdiction in a prior action involving the same parties and
based on the same cause of action).  Plastech argues that
Meridian could have raised the repayment issue at confirmation,
and, therefore, the entry of the Order confirming the Plan
without such a requirement bars Meridian from seeking that relief

26

now.

Plastech also argues that Meridian had to terminate the Trade Agreement and seek return of the Trade Payment before confirmation of its Plan because the Critical Vendor Orders on which Meridian rely were only operative during the pendency of the bankruptcy case.  Plastech notes that the Critical Vendor Orders specifically required it to provide Customary Trade Terms only "during the pendency of the chapter 11 cases."

Meridian disagrees with Plastech's argument.  It notes that nowhere in the Trade Agreement or the Critical Vendor Orders is there a requirement that Meridian seek return of the Trade Payment before confirmation of the Plan.  Meridian argues that it is not seeking to force Plastech to abide by the terms of the Trade Agreement post-confirmation.  Rather it is simply seeking damages for breaches of that Agreement which occurred during the pendency of the bankruptcy case.  Meridian argues that the Plan expressly preserved (and vested in reorganized Meridian) the right to pursue any action against a vendor, including Plastech. (J-79 at §§ 7.11 & 10.1)  Meridian asserts that to preserve a cause of action for post-confirmation adjudication, it is sufficient for a plan to specify the category or type of claim to be preserved, individual claims or specific defendants need not be identified.  See, e.g., In re Bridgeport Holdings, Inc., 326 B.R. 312, 326-27 (Bankr. D. Del. 2005) (holding that plan

27

documents "specify[ing] the category of causes of action to be preserved and the potential effect of the pursuit of those causes of action" adequately "preserved such causes of action for post-confirmation adjudication."); In re Pen Holdings, Inc., 316 B.R. 495, 504 (Bankr. M.D. Tenn. 2004) (stating that § 1123(b)(3) protects estate from loss of potential assets and is not designed to protect defendants from lawsuits); In re Associated Vintage Group, Inc., 283 B.R. 549, 566-67 (B.A.P. 9th Cir. 2002) (holding that representative of estate was not equitably estopped from bringing preference action against creditor because creditor knew true facts underlying preferential transfer and, therefore, could not suffer any cognizable injury by relying on conduct of debtor in the hope that there would be no challenge to such transfer).

The Court agrees with Meridian. The Plan expressly reserved to reorganized Meridian all Retained Actions which included actions against vendors. (FOF 95) Further, the Plan specifically referenced Plastech as one of five Excluded Parties against whom reorganized Meridian retained the right to pursue avoidance actions. (FOF 96) The Disclosure Statement advised all interested parties that reorganized Meridian may pursue avoidance actions and any other actions it may have against Excluded Parties after the Effective Date. (FOF 97) Therefore, the Court concludes that the Plan preserved Meridian's right to seek return of the Trade Payment from Plastech after the

Effective Date.

Plastech argues nonetheless that the Critical Vendor Orders state that it is the "intention of this Court to return the parties to the status quo in effect of [sic] the date of the entry of this order with respect to all prepetition claims." (Exs. J-6 at 4 & J-7 at 4)  Plastech asserts that this is impossible now that the Plan has been confirmed and the Effective Date has passed.  As a result, Plastech contends that it has lost valuable rights (1) to vote on the Plan, (2) to challenge the assignment of certain rights to reorganized Meridian or (3) to contest confirmation of the Plan.  Further, it argues that its right to pursue its pre-petition claim (including any reclamation rights it may have had) is seriously compromised by the passage of time and confirmation of Meridian's Plan.

Meridian responds that there is no requirement in the Trade Agreement that the parties be returned to the status quo and that the Critical Vendor Orders simply express an intention but not a condition to enforcement of the right to repayment of the Trade Payments.  In contrast, Meridian notes that the Critical Vendor Orders expressly obligate Plastech to return the Trade Payment in unequivocal terms.  Meridian asserts that Plastech had notice of the Plan (and knew of Meridian's claim against it for breach of the Trade Agreement) and could have protected its interests. Instead, Plastech did nothing.

29

Meridian also asserts that Plastech's reclamation rights, if any, were not affected by Meridian's alleged delay in asserting its rights. Instead, Meridian notes that Plastech waived its reclamation rights when it failed to file a reclamation claim by May 17, 2005 (before the final Critical Vendor Order dated May 26, 2005, and before Plastech executed the Trade Agreement on June 14, 2005). Therefore, Meridian asserts that any failure of Meridian to assert entitlement to repayment of the Trade Payment before the Order confirming the Plan was entered did not affect those rights.

The Court agrees with Meridian. The Plan reserved any claims Meridian had against vendors, including Plastech, under the avoidance sections of the Code or otherwise. (FOF 95, 96) The Plan expressly permitted the assertion by Meridian of its claims against Plastech after the Effective Date. (FOF 95-97) Plastech had notice of Meridian's claim for return of the Trade Payment at least as early as September 5, 2006. (FOF 55) This was three months before the Plan was confirmed. (FOF 93) Plastech could have protected its rights by seeking a ruling on Meridian's claim before the Plan was confirmed or by objecting to confirmation of the Plan.[7] It did nothing. Plastech is bound by the terms of the Plan which expressly preserved Meridian's claims

---

[7] Plastech was an unsecured creditor at the time because the Trade Payment did not pay all its pre-petition claims. (FOF 35, 36)

against it.  Therefore, the Court concludes that Meridian is not barred by the doctrine of <u>res judicata</u> from asserting its claim for return of the Trade Payment.

     F.   <u>Pre-Judgment Interest</u>

     Meridian also asserts that it is entitled to pre-judgment interest on its claim from the time it made demand on Plastech for return of the Trade Payment (January 19, 2007).  <u>See, e.g.</u>, <u>City of Milwaukee v. Cement Div., Nat'l Gypsum Co.</u>, 515 U.S. 189, 194 (1995) (holding that because no statute governs the award of pre-judgment interest in federal courts, any such award is a matter within the sound discretion of the court).  <u>See also</u> <u>CYCH, Inc. v. EVS Holding Co. (In re CYCH, Inc.)</u>, 2004 WL 941192, at *3 (Bankr. D. Del. Apr. 29, 2004); <u>Gorenstein Enters., Inc. v. Quality Care-USA, Inc.</u>, 874 F.2d 431, 439 (7th Cir. 1989).  Pre-judgment interest accrues from the date of demand.  <u>In re Cybermech, Inc.</u>, 13 F.3d 818, 822 (4th Cir. 1994).  In the absence of demand, pre-judgment interest runs from the date that the complaint was filed.  <u>In re Indus. & Mun. Eng'g, Inc.</u>, 127 B.R. 848, 851 (Bankr. C.D. Ill. 1990).

     The Court will grant the request for pre-judgment interest. The Trade Payment was a sum certain due in accordance with the terms of the Trade Agreement and Critical Vendor Orders. Meridian sent a request on January 19, 2007, for return of the Trade Payment and is entitled to interest on it from that date.

See, e.g., A.P.S., Inc. v. Standard Motor Products, Inc., 295
B.R. 442 (D. Del. 2003) (awarding pre-judgment interest for
breach of post-petition contract).   See generally Restatement
(Second) of Contracts § 354(1) (1981) ("If the breach consists of
a failure to pay a definite sum in money or to render performance
with fixed or ascertainable monetary value, interest is
recoverable from the time for performance on the amount due less
all deductions to which the party in breach is entitled."); 11-57
Arthur Linton Corbin et al., Corbin on Contracts §57.18 (2006)
("In all jurisdictions simple interest at the statutory legal
rate is recoverable as damages for non-payment of a liquidated
debt from the date of breach if the parties involved have not
themselves provided otherwise by contract.").

Meridian notes that the federal courts are not in agreement
concerning the rate at which pre-judgment interest should accrue.
See, e.g., Gorenstein, 874 F.2d at 437 (applying prime rate);
Transamerica Premier Ins. Co. v. Miller, 41 F.3d 438, 445-46 (9th
Cir. 1994) (following state pre-judgment rate); Dopp v. Pritzker,
38 F.3d 1239, 1252 (1st Cir. 1994) (using rate under local
rules); In re Nucorp Energy, Inc., 902 F.2d 729, 734 (9th Cir.
1990) (utilizing post-judgment rate designated by 28 U.S.C. §
1961); Peltz v. Worldnet Corp. (In re USN Communs., Inc.), 280
B.R. 573, 603 (Bankr. D. Del. 2002) (applying post-judgment
interest rate pursuant to 28 U.S.C. § 1961).   The determination

of the appropriate rate of interest to be awarded is within the Court's discretion.

The Court has previously awarded interest at the federal post-judgment rate.  That rate is appropriate in this case because there is no rate specified in the parties' Agreement and state law is not applicable to this dispute.  Accordingly, the Court will grant pre-judgment interest to Meridian on the Trade Payment from the date of request, January 19, 2007.

G.   Attorneys' Fees

Meridian also argues that it is entitled to attorneys' fees incurred in prosecuting the Compliance Motion.  See, e.g., In re Protarga, Inc., 329 B.R. 451, 479 (Bankr. D. Del. 2005) ("courts have inherent powers to enforce compliance with and execution of their lawful orders," which includes awarding reasonable attorneys' fees incurred in the enforcement of an order); In re Continental Airlines, Inc., 236 B.R. 318, 331 (Bankr. D. Del. 1999) (finding creditors in contempt of confirmation order and awarding debtor reasonable attorneys' fees incurred in prosecuting a motion to enforce its order).

In this case, the Court is not inclined to award attorneys' fees.  The "American Rule" is that each party is responsible for its own attorneys fees, regardless of who wins the suit.  However, a court, in the exercise of its equity powers, may award attorneys' fees to a party where the opponent has acted in bad

33

faith.  See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59 (1975); In re Fox, 725 F.2d 661 (11th Cir. 1984); In re Nangle, 281 B.R. 654 (B.A.P. 8th Cir. 2002); In re Neal, No. 05-01676, 2006 WL 1234961, at *1 (Bankr. D.D.C. Feb. 24, 2006); In re Reilly, 244 B.R. 46 (Bankr. D. Conn. 2000).  See generally "Attorney's Fees and the Federal Bad Faith Exception," 29 Hastings L. J. 319, 323-326 (1978).

The Court is not inclined to award attorneys' fees in this case because there is insufficient evidence that Plastech acted in bad faith in refusing to repay the Trade Payment.

IV.  CONCLUSION

For the reasons stated above, the Court will grant the Motion of Meridian Automotive Systems, Inc., to Compel Compliance with the Terms of the Critical Vendor Orders.

An appropriate Order is attached.

Dated: August 23, 2007          BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

34